# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### Case No. 20-cv-22783-BLOOM/Louis

KATHRYN BIRREN and
MANDY BIRREN,

      Plaintiffs,

v.

ROYAL CARIBBEAN CRUISES, LTD.,

      Defendant.

_____/

## <u>ORDER ON MOTIONS TO STRIKE/*DAUBERT* MOTIONS</u>

**THIS CAUSE** is before the Court upon Plaintiffs Kathryn Birren and Mandy Birren's (collectively, "Plaintiffs") *Daubert* Motions, ECF No. [92] ("Plaintiffs' Motion"). Defendant Royal Caribbean Cruises, LTD. ("Defendant") filed a Response in Opposition, ECF No. [107] ("Defendant's Response"), to which Plaintiffs filed a Reply, ECF No. [110] ("Plaintiffs' Reply"). Defendant filed a *Daubert* Motion to Strike Plaintiffs' Expert Dr. Nicholas Suite, ECF No. [93] ("Motion to Strike Suite") and a *Daubert* Motion to Strike Plaintiffs' Expert Jeffrey Hanson, ECF No. [94] ("Motion to Strike Hanson"). With regard to the Motion to Strike Suite, Plaintiffs filed a Response, ECF No. [102], to which Defendant filed a Reply, ECF No. [112]. With regard to the Motion to Strike Hanson, Plaintiffs filed a Response, ECF No. [101], but Defendant has not filed a Reply to Plaintiffs' Response. The Court has carefully reviewed the Motions, the record in this case, the applicable law, and is otherwise fully advised. For the reasons that follow, Plaintiffs' Motion is granted in part and denied in part consistent with this Order. Defendant's Motion to Strike Suite and Motion to Strike Hanson are granted in part and denied in part consistent with this Order.

## I.      BACKGROUND

Plaintiffs initiated this maritime personal injury action against Defendant on July 7, 2020. ECF No. [1]. Plaintiffs filed their First Amended Complaint, ECF No. [8] ("Amended Complaint"), on September 18, 2020. The Amended Complaint asserts nine counts against Defendant: Count I – Negligent Hiring and Retention; Count II – Negligent Supervision and Training; Count III – Negligent Failure to Warn of Dangerous Conditions; Count IV – Negligent Design, Installation, and/or Approval of the Subject Area and the Vicinity; Count V – Negligence Against Defendant for the Acts of its Crewmembers Based on Vicarious Liability; Count VI – Negligent Failure to Inspect, Clean, Maintain, Repair, Remedy, and/or Take Other Reasonable Measures for the Safety of Plaintiffs; Count VII – Vicarious Liability Against Defendant for the Negligence of the Ship's Medical Staff; Count VIII – Apparent Agency as to Defendant for the Acts of the Ship's Medical Staff; and Count IX – Assumption of Duty as to Defendant for the Negligence of the Ship's Medical Staff. *See generally* ECF No. [8].

Defendant retained Tray Edmonds ("Mr. Edmonds"), Dr. Jonathan Gottlieb ("Dr. Gottlieb"), Dr. Richard Rauck ("Dr. Rauck"), and Dr. Joseph Fernandez ("Dr. Fernandez") as expert witnesses. *See* ECF No. [107] at 1. Plaintiffs challenge all of the experts' opinions. *See* ECF No. [92]. Plaintiffs retained Dr. Nicholas Suite ("Dr. Suite") and Jeffery Hanson ("Mr. Hanson") as expert witnesses. *See* ECF Nos. [93], [94]. Defendant challenges both experts' opinions. *See* ECF Nos. [93], [94].

## II.     LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. When a party proffers the testimony of an expert under Rule 702, the party offering the expert testimony bears the burden of laying the proper foundation, and that party must demonstrate admissibility by a

preponderance of the evidence. *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). To determine whether expert testimony or any report prepared by an expert may be admitted, the court must engage in a three-part inquiry, which includes whether: (1) the expert is qualified to testify competently regarding the matters the expert intends to address; (2) the methodology by which the expert reaches his or her conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (citing *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)). The Court of Appeals for the Eleventh Circuit refers to each of these requirements as the "qualifications," "reliability," and "helpfulness" prongs. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). While some overlap exists among these requirements, the court must individually analyze each concept. *See id.*

As for the qualification prong, an expert may be qualified in the Eleventh Circuit "by knowledge, skill, experience, training, or education." *J.G. v. Carnival Corp.*, No. 12-21089-CIV, 2013 WL 752697, at *3 (S.D. Fla. Feb. 27, 2013) (citing *Furmanite Am., Inc. v. T.D. Williamson*, 506 F. Supp. 2d 1126, 1129 (M.D. Fla. 2007); Fed. R. Evid. 702). "An expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand." *Id.* (citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)). "[S]o long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." *See Clena Invs., Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012) (citing *Kilpatrick v. Breg, Inc.*, No. 08-10052-CIV, 2009 WL 2058384, at *1 (S.D. Fla. Jun. 25, 2009)). "After the district court undertakes a review of all of the relevant issues and of an expert's

qualifications, the determination regarding qualification to testify rests within the district court's discretion." *J.G.*, 2013 WL 752697, at *3 (citing *Berdeaux v. Gamble Alden Life Ins. Co.*, 528 F.2d 987, 990 (5th Cir. 1976)).[1]

Next, when determining whether an expert's testimony is reliable, "the trial judge must assess whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Frazier*, 387 F.3d at 1261-62 (citation omitted) (quotation marks omitted). To make this determination, the district court typically examines: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Id.* (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois, UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)). The Eleventh Circuit has emphasized that the four factors above are not exhaustive, and a court may need to conduct an alternative analysis to evaluate the reliability of an expert opinion. *See id.* at 1262 ("These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion."). Consequently, trial judges are afforded "considerable leeway" in ascertaining whether a particular expert's testimony is reliable. *Id.* at 1258 (citing *Kumho Tire Co.*, 526 U.S. at 152).

The final element, helpfulness, turns on whether the proffered testimony "concern[s] matters that are beyond the understanding of the average lay person." *Edwards v. Shanley*, 580 F. App'x 816, 823 (11th Cir. 2014) (quoting *Frazier*, 387 F.3d at 1262). "[A] trial court may exclude

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the Court of Appeals for the Fifth Circuit rendered prior to October 1, 1981.

expert testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained." *Id.* (quoting *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005)). To be appropriate, a "fit" must exist between the offered opinion and the facts of the case. *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 591). "For example, there is no fit where a large analytical leap must be made between the facts and the opinion." *Id.* (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997)).

Under *Daubert*, a district court must take on the role of gatekeeper, but this role "is not intended to supplant the adversary system or the role of the jury." *Quiet Tech.*, 326 F.3d at 1341 (citations omitted) (quotation marks omitted). Consistent with this function, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). "[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech.*, 326 F.3d at 1341 (citations omitted) (quotation marks omitted). Thus, the district court cannot exclude an expert based on a belief that the expert lacks personal credibility. *Rink*, 400 F.3d at 1293 n.7.

On the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596). "Thus, '[o]n cross-examination, the opposing counsel is given the opportunity to ferret out the opinion's weaknesses to ensure the jury properly evaluates the testimony's weight and credibility.'" *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988)). Ultimately, as noted, "a district court enjoys 'considerable leeway' in making" evidentiary

determinations such as these. *Cook ex rel. Est. of Tessier*, 402 F.3d at 1103 (quoting *Frazier*, 387 F.3d at 1258).

### III.   DISCUSSION

As an initial matter, the Parties do not dispute the experts' qualifications. Based on a review of the expert reports, the Court determines that each expert is qualified to opine on the matters covered in his respective expert report. As such, the Court proceeds to address each expert's reliability and helpfulness.

### a.   Plaintiffs' Motion

#### i.   Mr. Edmonds

Defendant retained Mr. Edmonds to testify about the subject elevator. *See* ECF No. [92-1] at 2. Plaintiffs argue that Mr. Edmonds' opinions do not utilize a reliable methodology and will not be helpful for the jury. *See* ECF No. [92] at 3-12. Defendant argues that Mr. Edmonds uses a reliable methodology and his opinions will assist the jury. *See* ECF No. [107] at 3-9. Although Plaintiffs' Motion challenges Mr. Edmonds' opinions by numbering them and grouping them together (i.e., first opinion; second, third, fourth, and fifth opinions; sixth, seventh, and eighth opinions; and ninth opinion), *see* ECF No. [92] at 5-11, the Court sees no need to analyze Mr. Edmonds' opinions in separate groups. The opinions are not numbered in Mr. Edmonds' expert report, some of the supposedly separate groups of opinions offer the same conclusion, and Plaintiffs' arguments – namely, that the opinions are not based on reliable methodology and will not be helpful for the jury – apply to all groups of opinions. As such, the Court addresses Plaintiffs' two main arguments in turn and identifies specific opinions only when it is necessary to do so.

### 1. Reliability

Plaintiffs' first general argument in regard to Mr. Edmonds' expert testimony is that Mr. Edmonds does not use reliable methods to reach his conclusions and provides no explanation as to why the jury should believe his opinions. *See* ECF No. [92] at 5. Defendant argues that Mr. Edmonds explains in his expert report the materials and methods he relied on to form his opinions. *See* ECF No. [107] at 3-8.

The Court agrees with Defendant that Mr. Edmonds used reliable methods. Mr. Edmonds' expert report states that he reviewed case-specific materials, the CCTV footage, mathematical calculations regarding kinetic energy, a site inspection, and various standards and codes. *See generally* ECF No. [92-1]. Mr. Edmonds states, after reviewing the CCTV footage, measurements taken during his site inspection, mathematical calculations of kinetic energy, and applicable safety codes, that the "door closing force and door closing kinetic energy" complied with pertinent codes at the time of the incident. *See* ECF No. [92-1] at 7. Mr. Edmonds further states that based on his review of Defendant's Elevator Safety Requirements and maintenance documents, the elevator was properly maintained and inspected. *See id.* at 11. The Court considers such methods to be reliable in forming his opinions about the functioning and maintenance of the elevator at or around the time of the incident.

To the extent that Plaintiffs argue that Mr. Edmonds' testimony should be not admitted because Mr. Edmonds does not make clear the documents and tests he relies on and because the Certificate of Inspection from KONE is not dated, *see* ECF No. [92] at 9, 10-11, the Court is not persuaded. As Defendant corectly notes, Mr. Edmonds tested the elevator door by taking pertinent measurements and calculating the elevator door's kinetic energy. *See* ECF No. [107] at 4 (citing ECF No. [92-1] at 19). Mr. Edmonds also notes the exact standards and codes he reviewed in

conjunction with his measurements to form his expert opinion. *See* ECF No. [92-1] at 4, 6. As such, Mr. Edmonds makes sufficiently clear the documents and tests on which he relies. Plaintiffs may, of course, explore any weaknesses in Mr. Edmonds' documents and tests at cross-examination, but they are not grounds to exclude his opinions. *See Pleasant Valley Biofuels, LLC v. Sanchez-Medina*, No. 13-23046-CIV, 2014 WL 2855062, at *5 (S.D. Fla. June 23, 2014).[2]

However, the Court is persuaded by Plaintiffs' argument that Mr. Edmonds' specific opinion that a "small girl" broke the elevator panel when she pressed an elevator button with her elbow is not reliable. *See* ECF No. [92] at 6-8.[3] Unlike his other opinions, Mr. Edmonds' particular opinion regarding the "small girl" appears to be based solely on his review of the CCTV footage. *See* ECF No. [92-1] at 10 ("*Based upon a review of the video showing the events surrounding this case*, a small girl enters elevator #PL17 at or around 8:47:32 pm with an adult female. The girl utilizes an improper method to press a button (she used her elbow to jab the button instead of pressing the button with her finger) on the left car operating panel. Based upon the subsequent operation of the elevator doors, it appears the door close button was stuck in the 'pressed' position." (emphasis added)). Mr. Edmonds did not review other materials or conduct any scientific tests to rule out other potential causes of the elevator malfunctioning. *See* ECF No. [92-1] at 6, 10. In short, Mr. Edmonds' opinion on this matter is pure speculation based solely on his view of the CCTV footage. His expert opinion on this issue is not based on reliable, scientifically

---

[2] Plaintiffs also argue that Mr. Edmonds' site inspection over two years after the incident cannot be used to form his opinion of the incident in question. *See* ECF No. [92] at 9. The argument is unavailing. There is no evidence that the physical features of the elevator doors materially changed, and Mr. Edmonds can rely on his measurements of the elevator door two years after the incident to calculate kinetic energy. Further, since site inspections are routine parts of reliable methodology, Mr. Edmonds' inspection the elevator door two years after the incident may be a part of his overall methodology.

[3] Plaintiffs refer to the specific opinion as Mr. Edmonds' second and fourth opinions. *See* ECF No. [92] at 6-7.

valid methodology. As such, Mr. Edmonds' testimony on this matter is inadmissible. *See Frazier*, 387 F.3d at 1261-62. The Court need not address Plaintiffs' other arguments on this matter.

Plaintiffs also argue that Mr. Edmonds' opinions should be limited to the time period depicted in the CCTV, especially since the opinions in his expert report pertain to that time period only. *See* ECF No. [92] at 6. Defendant does not address this specific argument. *See* ECF No. [107] at 3-8. Plaintiffs' argument on this issue is well-taken. *See* ECF No. [92] at 6. Mr. Edmonds does not appear to offer any testimony beyond the time period depicted in the CCTV. *See generally* ECF No. [92-1]. Therefore, Mr. Edmonds' opinions will be limited to the time period depicted in the CCTV footage.[4]

### 2. Helpfulness

The Court now addresses whether Mr. Edmonds' opinions, other than the inadmissible opinions noted above, are helpful. Plaintiffs argue that Mr. Edmonds' opinions are not helpful for the jury because he merely reviews the CCTV footage. ECF No. [92] at 11-12. Defendant argues that Mr. Edmonds' opinions are helpful because his opinions about the elevator doors' kinetic energy and how it should be interpreted within the context of pertinent European Union elevator codes are beyond the understanding of the average lay person. *See* ECF No. [107] at 8-9. Defendant also argues that if the Court were to find inadmissible Mr. Edmonds' review of the CCTV footage because the footage speaks for itself, then Plaintiffs' expert's testimony regarding the CCTV footage should be similarly inadmissible. *See* ECF No. [107] at 9.

The Court determines that Mr. Edmonds' opinions – other than the inadmissible opinion about the "small girl" addressed above – rely not only on the CCTV footage but also on his analysis of kinetic energy and his review of relevant codes. *See* ECF No. [92-1] at 10-11. The Court

---

[4] However, to be clear, Mr. Edmonds will be permitted to testify about his review of the inspections that took place before and after the incident as they were the bases for his opinions of the subject incident.

considers such analysis to be beyond the understanding of the average lay person. As such, Mr. Edmonds may offer the opinions he formed partly relying on the CCTV footage. *See Edwards*, 580 F. App'x at 823. However, in *Jackson v. Catanzariti*, No. 6:12-CV-113, 2019 WL 2098991, at *9 (S.D. Ga. May 14, 2019), the court found that an expert could not give a general overview of what a particular video showed without offering "expert gloss or explanation" because the jury could determine for itself the contents of the video. As such, Plaintiffs are persuasive to the extent that any testimony that merely provides an overview of the CCTV footage itself would not be helpful. In short, the CCTV footage speaks for itself and any testimony offering general observations of the CCTV footage is inadmissible, but Mr. Edmonds' expert opinion based on the footage does not speak for itself and is admissible.

In sum, Mr. Edmonds will be permitted to offer his expert testimony on all matters in his expert report, except for (1) his opinion about the small girl breaking the elevator door, and (2) general observations of the CCTV footage.

### ii. Dr. Gottlieb

Defendant retained Dr. Gottlieb to testify about Plaintiffs' medical conditions. *See generally* ECF Nos. [92-3]; [107-1]. Dr. Gottlieb purports, among other things, that the cause of Plaintiff Kathryn Birren's injuries is not the subject incident but a motor vehicle accident. *See* ECF No. [92-3] at 7.

### 1. Testimony about Mandy Birren

As a preliminary matter, Plaintiffs argue that Dr. Gottlieb should be prohibited from testifying about Plaintiff Mandy Birren because his expert report focuses only on Plaintiff Kathryn Birren. *See* ECF No. [92] at 13. Defendant responds that Dr. Gottlieb prepared a separate expert report based upon his review of Plaintiff Mandy Birren's medical records and physical

examination and that the report was properly produced to Plaintiffs. *See* ECF No. [107] at 9-10; *see also* ECF No. [107-1]. Plaintiffs state that Plaintiffs' Counsel was not served the second expert report but that they withdraw their objection for the purposes of the instant Motion. *See* ECF No. [110] at 5. Therefore, Dr. Gottlieb may testify regarding Plaintiff Mandy Birren's medical condition.

### 2. Testimony about Kathryn Birren

Plaintiffs argue that Dr. Gottlieb should be prohibited from testifying about Plaintiff Kathryn Birren's medical condition, including the cause of Plaintiff's injury, because Dr. Gottlieb's opinions are not based on reliable methodology and are not helpful for the jury. *See* ECF No. [92] at 12-14. Plaintiffs argue that Dr. Gottlieb's opinions are not based on reliable methodology because Dr. Gottlieb admits that he does not have MRIs or any other images of Plaintiff Kathryn Birren's cervical spine that are required to offer "definitive opinions on causality and the need for lumbar spine treatment[.]" *Id.* at 13 (citing ECF No. [92-3] at 7). Plaintiffs also argue that Dr. Gottlieb's opinions are not helpful because he merely reviews the CCTV footage. *See id.* at 14. Defendant responds that Dr. Gottlieb states that his opinions are based on his experience as a board-certified orthopedic spine surgeon, combined with a "physical examination, review [of] medical records, and review [of] supporting documentation related to this incident." ECF No. [107] at 11 (quoting ECF No. [92-3] at 4).

The Court agrees with Defendant. First, in regard to reliability, although Plaintiffs claim that Dr. Gottlieb did not review relevant scans and images, Dr. Gottlieb's report states that he reviewed several medical reports produced by other medical professionals that contained imaging reports. *See* ECF No. [92-1] at 3. It is well-established that experts can rely on the opinions of others in forming their opinions. *See Daubert*, 509 U.S. at 592; *In re 3M Combat Arms Earplug*

*Prod. Liab. Litig.*, No. 3:19-md-2885, 2021 WL 765019, at *45 (N.D. Fla. Feb. 28, 2021) (finding that an expert's opinion was admissible because it did not "simply parrot" another other expert's testimony).[5] Therefore, Dr. Gottlieb's use of other medical professionals' imaging reports is permissible and sufficiently reliable. In addition, although Plaintiffs argue that Dr. Gottlieb fails to explain how his review of the materials led to his conclusions, *see* ECF No. [92] at 13, Dr. Gottlieb's report suggests otherwise, *see* ECF No. [92-3] at 7 ("Treatment rendered to the cervical spine following the subject incident through the occurrence of the motor vehicle accident was reasonable and necessitated by the subject accident. However, it is my opinion that the ultimate need for surgical treatment was not the September 7, 2019 incident. This opinion is based primarily on the provided medical records and the imaging reports.").

Further, to the extent that Plaintiffs argue inadmissibility because Dr. Gottlieb admits he cannot form a more definitive opinion and would have preferred to review MRI films himself, the Court is not persuaded. Dr. Gottlieb states that "prior to offering definitive opinions on causality and the need for lumbar spine treatment I would prefer to review the lumbar spine MRI[,]" ECF No. [92-3] at 7. However, he also states that "[t]he opinions expressed in this report are all within a reasonable degree of medical certainty and based on my personal assessment of the claimant and review of supporting documentation[,]" *id.* at 8. The Court considers such a statement to satisfy the *Daubert* standard for reliability since Dr. Gottlieb clearly states that although he would have preferred to review additional evidence, the opinions he did express are within a reasonable degree of medical certainty. As noted above, it is also evident that Dr. Gottlieb reviewed pertinent medical

---

[5] As Defendant correctly points out, Plaintiffs' representation that Dr. Gottlieb did not consult medical records from practitioners – other than records from a chiropractor – regarding Plaintiff Kathryn Birren's lower back pain misconstrues Dr. Gottlieb's expert report. *See* ECF No. [107] at 13. Other practitioners did not see Plaintiff Kathryn Birren regarding her lower back, and Dr. Gottlieb cannot consult nonexistent medical records. *See id.*

records in forming his conclusion. *See id.* at 7. Therefore, Dr. Gottlieb's stated preference to review the MRIs himself goes to the weight of the evidence, not its admissibility. Plaintiffs may cross-examine Dr. Gottlieb to the extent that he did not review the lumbar spine MRIs himself and instead relied on other medical experts' review of the MRIs.[6]

Next, in regard to helpfulness, although Dr. Gottlieb relies on CCTV footage, Dr. Gottlieb also relies on his analysis of extensive medical records as noted above. *See* ECF No. [92-3] at 7. As such, contrary to Plaintiffs' argument that Dr. Gottlieb's review of the CCTV footage involved "no scientific analysis whatsoever[,]" ECF No. [110] at 6-7, Dr. Gottlieb appears to have used the CCTV footage in conjunction with other medical records to conduct an expert medical diagnosis of the cause of Plaintiff Kathryn Birren's injury. As before, the Court considers the use of CCTV footage in conjunction with other medical records and the resulting medical conclusions to go beyond the expertise of the average lay person. As such, Dr. Gottlieb's opinions will be helpful to the jury, and he may offer the opinions he formed partly relying on the CCTV footage. *See Edwards*, 580 F. App'x at 823. However, as stated before, the Court agrees with Plaintiffs to the extent that any testimony that merely provides an overview of the CCTV footage itself would not be helpful. *See Jackson*, 2019 WL 2098991, at *9.

As such, all of Dr. Gottlieb's opinions will be admissible, but Dr. Gottlieb will not be permitted to provide an overview of the CCTV footage, which speaks for itself.

### iii.    Dr. Rauck

Defendant retained Dr. Rauck to testify about Plaintiff Mandy Birren's medical conditions. *See generally* ECF No. [92-4]. Dr. Rauck opinests that Plaintiff Mandy Birren's alleged Amplified

---

[6] Plaintiffs' argument that Dr. Gottlieb did not review photos or other materials from the car accident similarly goes to the weight of Dr. Gottlieb's opinion, not its admissibility. *See* ECF No. [110] at 5-6. Plaintiffs may cross-examine Dr. Gottlieb on whether he reviewed photos or other evidence from the car accident.

Musculoskeletal Pain Syndrome ("AMPS") was not caused by Plaintiff Kathryn Birren bumping into her and that Plaintiff Mandy Birren's gymnastics and trampoline activities caused greater force on her back than the incident in question. *See id.* at 7.

### 1.  Testimony about Kathryn Birren

As a preliminary matter, Plaintiffs argue that Dr. Rauck should be prohibited from testifying about Plaintiff Kathryn Birren. *See* ECF No. [92] at 16. Defendant agrees. *See* ECF No. [107] at 15. Therefore, Dr. Rauck may not testify regarding Plaintiff Kathryn Birren's medical conditions.

### 2.  Testimony about Mandy Birren

Plaintiffs argue that Dr. Rauck should be prohibited from testifying about Plaintiff Mandy Birren's alleged AMPS because Dr. Rauck's opinions are not based on reliable methodology and will not be helpful for the jury. *See* ECF No. [92] at 16. Plaintiffs argue that Dr. Rauck's methodology is not reliable because Dr. Rauck does not discuss how he arrived at his conclusions, admits that AMPS pathophysiology is "poorly understood," and speculates that Plaintiff Mandy Birren's gymnastics and trampoline activities exerted a greater force on her body than the incident in question. *See id.* at 16-17. Plaintiffs also argue that Dr. Rauck's opinions, much like Dr. Gottlieb's opinions, will not be helpful for the jury because he merely reviewed the CCTV footage. *See id.* at 18. Defendant responds that Dr. Rauck's methodology is reliable because he reviewed medical records reflecting Plaintiff Mandy Birren's medical treatment since 2013, Plaintiff Mandy Birren's deposition and interrogatories, and CCTV footage of the subject incident. *See* ECF No. [107] at 15-16. Defendant does not, however, address Plaintiffs' claim that Dr. Rauck's opinion will not be helpful. *See generally id.*

In regard to reliability, the Court agrees with Defendant. As Defendant correctly notes, Dr. Rauck's report expressly provides numbered paragraphs, each containing a conclusion and supporting rationale. *See* ECF No. [107] at 16 (citing ECF No. [92-4] at 6-7). Further, Dr. Rauck's opinion regarding Plaintiff Mandy Birren's gymnastic and trampoline activities is based Dr. Rauck's review of an MRI and Plaintiff Mandy Birren's medical history. *See* ECF No. [92-4] at 7. Dr. Rauck also explains that trauma rarely causes AMPS, which supports his opinion that gymnastic and trampoline activities, rather than the trauma of colliding with Plaintiff Kathryn Birren, are the causes of Plaintiff Mandy Birren's alleged AMPS. *See id.* at 6. Considering Dr. Rauck's medical expertise and his review of Plaintiff Mandy Birren's MRI and pertinent medical history, the Court determines that Dr. Rauck's expert opinion on the causal effect of gymnastic and trampoline activities is reliable.

Further, the fact that Dr. Rauck states that AMPS is "poorly understood" does not render his methodology unreliable. As long as the methodology is reliable, expert testimony may be admissible even if the medical condition itself is poorly understood. Here, Dr. Rauck's expert testimony is based on a review of Mandy Birren's medical records and his years of experience as a medical professional. *See* ECF No. [92-4] at 1. The Court considers such a methodology to be sufficiently reliable even if the medical condition is poorly understood generally.[7]

Additionally, in regard to helpfulness, although Dr. Rauck relies on the CCTV footage, Dr. Rauck also relies on his analysis of extensive medical records, similar to Dr. Gottlieb's partial reliance on the CCTV footage. *See* ECF No. [92-4] at 2, 7. As before, Dr. Rauck appears to have

---

[7] To the extent that Plaintiffs argue that Dr. Rauck offers no explanation for how he reached this conclusion that Plaintiff Mandy Birren's treating physician, Dr. Trinidad, "is simply wrong[,]" *see* ECF No. [92] at 17 (quoting ECF No. [92-4] at 7), the Court is not persuaded. Dr. Rauck explains that Dr. Trinidad is "simply wrong" because Dr. Trinidad made is conclusion without a physical exam and despite an MRI that shows no facet pathology. *See* ECF No. [92-4] at 7.

used the CCTV footage in conjunction with the medical records to conduct a scientific analysis of the cause of Plaintiff Mandy Birren's injury. *See id.* at 1. The Court again considers such medical analysis that only partly relies on the CCTV footage to be beyond the understanding of the average lay person and helpful for the jury. *See Edwards*, 580 F. App'x at 823. However, although Dr. Rauck's medical opinions are admissible, for the same reasons stated above, Dr. Rauck is not permitted to give a general overview of the CCTV footage, which speaks for itself. *See Jackson*, 2019 WL 2098991, at *9.

In sum, Dr. Rauck's testimony concerning Plaintiff Mandy Birren is admissible, but Dr. Rauck will not be permitted to give an overview of the CCTV footage.[8]

### iv.   Dr. Fernandez

Defendant retained Dr. Fernandez as an orthopedic expert to testify about Plaintiff Kathryn Birren's shoulder. *See* ECF No. [92-5]. Defendant states that Dr. Fernandez will serve as a rebuttal witness in the event that Plaintiff Kathryn Birren argues that she will require future treatment for her right shoulder as a result of the subject incident. *See* ECF No. [107] at 17.

### 1.   Testimony about Mandy Birren

As a preliminary matter, Plaintiffs argue that Dr. Fernandez should be prohibited from testifying about Plaintiff Mandy Birren. *See* ECF No. [92] at 19. Again, Defendant agrees. *See* ECF No. [107] at 18. Therefore, Dr. Fernandez may not testify regarding Mandy Birren's medical condition.

---

[8] To the extent that Plaintiffs contend that Dr. Rauck should not be permitted to testify about Plaintiff Mandy Birren's eating disorder, the Court notes that Plaintiffs do not cite any part of Dr. Rauck's report that allegedly discusses Plaintiff Mandy Birren's eating disorder. *See* ECF No. [92] at 16. Dr. Rauck's testimony will be limited to his expert report.

### 2.  Testimony about Kathryn Birren

Plaintiffs argue that Dr. Fernandez should not be permitted to testify about Plaintiff Kathryn Birren's medical conditions other than her right shoulder because his expert report is limited to the shoulder and because he offers no causation opinions. *See* ECF No. [92] at 19. Plaintiffs also argue that Dr. Fernandez's opinion will not be helpful because he is a cumulative expert in light of Dr. Gottlieb who is also an orthopedic expert. *See* ECF No. [92] at 20. Defendant clarifies in its Response that Dr. Fernandez will only testify about Plaintiff Kathryn Birren's shoulder. *See* ECF No. [107] at 17-18. Defendant also notes that Dr. Fernandez will not offer a causation opinion and only offer an opinion about the need for future treatment as a potential rebuttal witness. *See id.* at 18.

Based on Defendant's characterization of Dr. Fernandez's expert opinion, the Court agrees. Plaintiffs' argument that Dr. Fernandez should not be permitted to testify about medical conditions other than Plaintiff Kathryn Birren's shoulder is moot since Dr. Fernandez will only testify about Plaintiff Kathryn Birren's shoulder. Further, because Dr. Gottlieb's testimony is limited to Plaintiff Kathryn Birren's spine and Dr. Fernandez's testimony is limited to Plaintiff Kathryn Birren's shoulder, Dr. Fernandez is not a cumulative expert.

In sum, Dr. Fernandez's opinion regarding Plaintiff Kathryn Birren's shoulder is admissible in its entirety.[9]

### b.  Defendant's Motion to Strike Suite

The Court now addresses Defendant's Motion to Strike Suite. Plaintiffs retained Dr. Suite to give his expert opinion on the causes of Plaintiff Kathryn Birren's injuries. *See* ECF No. [93-1]

---

[9] Plaintiffs argue that Dr. Fernandez should not be permitted to refer to Plaintiff Kathryn Birren as his "patient" because there is no doctor patient relationship between Plaintiff Kathryn Birren and Dr. Fernandez. *See* ECF No. [92] at 19. That argument is well-taken. Dr. Fernandez shall not be permitted to refer to Plaintiff Kathryn Birren as his patient.

at 4. Defendant argues that Dr. Suite's methodology is not reliable because Dr. Suite only conducted a telemedicine examination. *See* ECF No. [93] at 4-5. Defendant emphasizes that Dr. Suite admitted that if he had conducted a physical examination, he "would better be able to opine on future costs, reasonableness, specific causation, and whether all bills are related and necessary. A telemedicine examination alone and review of records is not able to fulfill all of the elements of an in-person examination." *Id.* at 5 (quoting ECF No. [93-1] at 4). Based on Dr. Suite's own admission, Defendant argues that Dr. Suite was unable to confirm his own impressions and his opinions are speculative. *See id.* at 7. Defendant also argues that Dr. Suite has not provided specific opinions regarding future treatment, future costs, and reasonableness of medical bills, and his testimony on those matters should be inadmissible. *See* ECF No. [112] at 2.

Plaintiffs concede that Dr. Suite did not conduct an in-person examination but argue that Dr. Suite reviewed Plaintiff Kathryn Birren's medical records, CCTV footage of the incident, films, MRI scans, testimony, and other evidence, in addition to the telemedicine examination. *See* ECF No. [102] at 8. As such, Plaintiffs argue that Dr. Suite's methodology is reliable. *See id.* Plaintiffs also note that even if the telemedicine evaluation did not take place, the court in *Geyer v. NCL (Bahamas) Ltd.*, 203 F. Supp. 3d 1212 (S.D. Fla. 2016), found that the lack of a medical examination did not necessarily render an expert medical opinion inadmissible under *Daubert*. *See* ECF No. [102] at 10.

The Court agrees with Plaintiffs to the extent that Dr. Suite's causation opinion is based on reliable methodology. Dr. Suite's expert report clearly describes his review of medical records, CCTV footage of the incident, and other evidence. *See* ECF No. [93-1] at 3-4. In addition, although Defendant takes issue with Dr. Suite's admission that he would be better able to discuss aspects of his opinions after an in-person physical examination, the Court notes that Dr. Suite did not

18

affirmatively state that the lack of an in-person physical examination prevented him forming a reliable opinion. Rather, even though Dr. Suite conceded that a telemedicine examination does not fulfill all of the elements of an in-person examination, he nonetheless formed his conclusions regarding the cause of the injuries "within a reasonable degree of medical probability." ECF No. [93-1] at 4. Given that experts may rely on a review of medical records alone, without an examination of any type, to form expert medical opinions regarding causation, the Court considers Dr. Suite's methodology to be sufficiently reliable. *See Geyer*, 203 F. Supp. 3d 1212. Put differently, a telemedicine examination may not fulfill all of the elements of an in-person examination but it does not render such examinations to be inherently unreliable, especially when telemedicine examinations are used in conjunction with other medical records. Defendant's arguments regarding the use of telemedicine and Dr. Suite's express preference for an in-person physical examination are more appropriate for cross-examination and are not proper grounds to strike Dr. Suite's causation opinion.

However, Defendant correctly points out that Dr. Suite does not elaborate on his opinions regarding future treatment, future costs, and reasonableness of medical bills in his expert report. *See* ECF No. [112] at 2; *see generally* ECF No. [93-1]. Dr. Suite states in his expert report that "[s]he is going to need further care and treatment to manage her symptomatology." *Id.* at 4. Dr. Suite, however, does not offer the precise treatment needed, dollar figure estimates of the future costs, or reasonableness of any medical bills. As such, any expert testimony on such matters would go beyond the scope of Dr. Suite's expert report and is inadmissible.

In sum, Dr. Suite will be permitted to testify about medical causation, but Dr. Suite will not be permitted to testify about future treatment, future costs, and medical bills.[10]

### c.  Defendant's Motion to Strike Hanson

The Court now addresses Defendant's Motion to Strike Hanson. Plaintiffs retained Mr. Hanson to testify about the elevator. *See* ECF No. [94-1] at 3-6. Defendant argues that Mr. Hanson's opinions regarding the inadequate maintenance of the subject elevator are unreliable (or unexplained) because Mr. Hanson only reviewed materials relating to events that took place after the subject incident, which shed no light on the subject incident. *See* ECF No. [94] at 4. Defendant further argues that Mr. Hanson's opinions are not helpful to the jury because he merely offers his own interpretation of the CCTV footage. *See id.* at 4-6. Plaintiffs respond that Mr. Hanson's methodology is reliable because Mr. Hanson conducted a site inspection and reviewed various elevator inspections. *See* ECF No. [101] at 11-13. Although Plaintiffs do not specifically address Defendant's contention regarding the helpfulness of Mr. Hanson's overview of the CCTV footage, Plaintiffs generally argue that Mr. Hanson's opinions will be helpful for the jury. *See id.* at 13-14.

The Court agrees with Plaintiffs. Mr. Hanson's expert report contains a lengthy discussion of his methodology, which includes a review of inspection reports from shortly before the subject incident, industry code, and CCTV footage. *See* ECF No. [101] at 6 (quoting excerpts from Mr. Hanson's expert report in which Mr. Hanson notes that he reviewed maintenance checklists from before the incident). The Court considers the review of such materials, combined with Mr. Hanson's expertise, to be sufficiently reliable in forming Mr. Hanson's opinions regarding the maintenance of the elevator. Further, Mr. Hanson's opinions are helpful because they only partly

---

[10] Plaintiffs request a *Daubert* hearing in regard to Dr. Suite. *See* ECF No. [102] at 11-12. The Court does not find a hearing to be necessary to resolve the issues presented in the pleadings. As such, the Court denies Plaintiffs' request for a hearing.

rely on the CCTV footage and also rely on other relevant materials. As noted above, opinions partly relying on the CCTV footage in conjunction with other materials are helpful to the jury and admissible. *See Edwards*, 580 F. App'x at 823. However, similar to several aforementioned experts, Mr. Hanson will not be permitted to give a general overview of the CCTV footage itself since the CCTV footage speaks for itself.[11]

In sum, Mr. Hanson will be permitted to offer his expert opinion, but he will not be permitted to provide an overview of the CCTV footage.[12]

### IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiffs' Motion, **ECF No. [92]**, is **GRANTED IN PART AND DENIED IN PART**.

2. Defendant's Motion to Strike Suite, **ECF No. [93],** is **GRANTED IN PART AND DENIED IN PART**.

3. Defendant's Motion to Strike Hanson, **ECF No. [94],** is **GRANTED IN PART AND DENIED IN PART**.

---

[11] Defendant references *Umana-Fowler v. NCL (Bahamas) Ltd*., which established that while "[a]n expert may testify as to his opinions on an ultimate issue of fact . . . he may not testify as to his opinion regarding ultimate legal conclusions." ECF No. [94] at 5 (quoting 49 F.Supp.3d 1120, 1122 (S.D. Fla. 2014) (internal quotation marks and citation omitted)). Defendant, however, fails to identify which opinion reaches ultimate legal conclusions. *See id.* To the extent that any of Mr. Hanson opinions reach an ultimate issue, Plaintiffs argue that Mr. Hanson's opinions are nonetheless admissible because they will be helpful to the jury. *See* ECF No. [101] at 14. Because Defendant does not specify which opinion reaches an ultimate issue, Defendant's argument is unpersuasive. To the extent that Defendant is arguing that Mr. Hanson's review of the CCTV footage speaks for itself, the Court is persuaded for the reasons stated above.

[12] Plaintiffs request a *Daubert* hearing in regard to Dr. Hanson as well. *See* ECF No. [101] at 14-15. The Court does not find a hearing to be necessary to resolve the issues presented in the pleadings. As such, the Court denies Plaintiffs' request for a hearing.

Case No. 20-cv-22783-BLOOM/Louis

**DONE AND ORDERED** in Chambers at Miami, Florida, on February 14, 2022.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record